1

2

3

4

5

6

7                   IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF OREGON

9                         PORTLAND DIVISION

10

THERESA ROBINSON,              )
11        an individual,             )
                                )
12                  Plaintiff,       )    No. CV-09-3083-HU
                                )
13        v.                        )
                                )
14   MICHAEL ASTRUE              )    OPINION AND ORDER
          Commissioner of Social   )
15        Security,                )
                                )
16                  Defendant.      )
   ─────────────────────────────)

17

18

Arthur Wilber Stevens , III
19   BLACK CHAPMAN WEBBER & STEVENS
     221 Stewart Avenue, Suite 209
20   Medford, OR 97501
          Attorneys for Plaintiff

21

22   Adrian Brown
     U.S. ATTORNEY'S OFFICE
23   District of Oregon
     1000 S.W. Third Avenue, Suite 600
24   Portland, OR 97204

25   Gerald Hill
     SOCIAL SECURITY ADMINISTRATION
26   Office of the General Counsel
     701 Fifth Avenue, Suite 2900, M/S 221A
27   Seattle, WA 98104
          Attorneys for Defendants

28

1  HUBEL, Magistrate Judge:

2      Plaintiff Theresa Robinson brings this action pursuant to

3  section 405(g) of the Social Security Act (the "Act") to obtain

4  judicial review of a final decision of the Commissioner denying

5  her application for disability insurance benefits ("DIB") and

6  supplemental security income ("SSI").  I affirm the decision of

7  the Commissioner.

8                      **DISABILITY ANALYSIS**

9      The Social Security Act (the "Act") provides for payment of

10 disability insurance benefits  to people who have contributed to

11 the Social Security program and who suffer from a physical or

12 mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the

13 Act, supplemental security income benefits may be available to

14 individuals who are age 65 or over, blind, or disabled, but who do

15 not have insured status under the Act.  42 U.S.C. § 1382(a).

16     The claimant must demonstrate an inability to engage in any

17 substantial gainful activity by reason of any medically

18 determinable physical or mental impairment which can be expected to

19 cause death or to last for a continuous period of at least twelve

20 months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An

21 individual will be determined to be disabled only if his physical

22 or mental impairments are of such severity that he is not only

23 unable to do his previous work but cannot, considering his age,

24 education, and work experience, engage in any other kind of

25 substantial gainful work which exists in the national economy.  42

26 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

27     The Commissioner has established a five-step sequential

28 evaluation process for determining if a person is eligible for

OPINION AND ORDER 2

either DIB or SSI due to disability.  The claimant has the burden of proof on the first four steps.  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 C.F.R. §§ 404.1520(d) and 416.920(d).   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.   If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the

OPINION AND ORDER 3

1  past, the Commissioner proceeds to the fifth and final step to
2  determine if the claimant can perform other work in the national
3  economy in light of his or her age, education, and work experience.
4  The burden shifts to the Commissioner to show what gainful work
5  activities are within the claimant's capabilities. *Parra*, 481 F.3d
6  at 746. The claimant is entitled to disability benefits only if he
7  or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f)
8  and 416.920(f).

9                           **STANDARD OF REVIEW**

10      The court must affirm a denial of benefits if the denial is
11  supported by substantial evidence and is based on correct legal
12  standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.
13  2005). Substantial evidence is more than a "mere scintilla" of the
14  evidence but less than a preponderance. Id. "[T]he commissioner's
15  findings are upheld if supported by inferences reasonably drawn
16  from the record, and if evidence exists to support more than one
17  rational interpretation, we must defer to the Commissioner's
18  decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003)
19  (internal citations omitted). Thus, the question before the court
20  is not whether the Commissioner reasonably could have reached a
21  different outcome, but whether the Commissioner's final decision is
22  supported by substantial evidence. See Magallanes v. Bowen, 881
23  F.2d 747, 750 (9th Cir. 1989).

24                          **THE ALJ'S DECISION**

25      The Administrative Law Judge ("ALJ") found that Robinson
26  suffered from the severe impairments of myofascial pain syndrome,
27  mild left knee osteoarthritis with Baker's cyst, bilateral lower
28  extremity varicose veins, depression, and cognitive disorder NOS.

OPINION AND ORDER 4

The ALJ found that Robinson had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: Robinson needs the option to alternate between sitting and standing at will; she should only occasionally climb ramps or stairs, bend, crouch, stoop, or balance; she should never crawl or climb ladders/ropes/scaffolds; she should avoid hazards due to narcotic use; she should have no public contact; and she should perform tasks limited to 1 to 3 steps which are consistent with entry level work in the Dictionary of Occupational Titles ("DOT"). Based on the above limitations the ALJ concluded that Robinson could work as a garment sorter, an office helper, or a table worker.

## FACTS

Theresa Robinson was 40-years-old at the time of her alleged onset of disability, on July 1, 1999. Tr. 55. Robinson is 5'2", and roughly 190 lb. Tr. 155. She has a 10th grade education, Tr. 373, and has worked as a candy striper, kitchen worker, fast food worker, finance collector, and as a cashier. Tr. 157, 374. She has two adult daughters and a granddaughter. Tr. 373. Robinson moved to the Grants Pass area of Oregon from Tulsa, Oklahoma in May of 2003. Tr. 338. She alleges disability due to short term memory loss, and back, arms, shoulder, neck, and hand problems. Tr. 156.

Throughout the period of alleged disability, Robinson has raised her granddaughter. Tr. 352. She drives, shops, and otherwise runs her own household, with some help from a daughter who lives next door. Tr. 352. She can move heavy furniture and during the period of disabiity worked intermittently at Goodwill, Salvation Army, Credit Counseling, and a furniture store. Tr. 352.

OPINION AND ORDER 5

1    In February 2001, Robinson reported to Dr. Christopher Chow
2  that she had pain in her back that was "10/10 intensity." Tr. 192.
3  Dr. Chow gave her Percocet, and encouraged her to get a back
4  support brace.  Tr. 192.  She did not mention any pain in her left
5  arm or hand at that time,  Tr. 192, nor in any of her other visits
6  from October 2000 to January 2003.  Tr. 190-212.  Nor did she ever
7  obtain a back brace.  Tr. 193.

8    On July 10, 2003, Robinson established care with Dr. Eric
9  Perry, an internist, as her primary care physician.  That day, she
10 complained of neck and  back pain.  Tr. 228.  She sought "a refill
11 on her narcotics."  Tr. 228. Robinson's reported history to Dr.
12 Perry  included:  "intolerance  to  all  nonsteroidal  anti-
13 inflammatories,  muscle  relaxants  and  gets  relief  only  on
14 narcotics," past surgeries of a hysterectomy in 1990, one ovary
15 removed in 1995, tubal ligations in 1983, cholecystectomy and
16 appendectomy in 1999, as well as current medications of Paxil 40
17 mg, hydrocodone 7.5/500 mg, Vioxx 50 mg, and Zanaflex.  On November
18 14, 2003, Robinson presented to Dr. Perry complaining of pain "all
19 over my body.  She states there is not an area on her that does not
20 scream with pain." Tr. 225.  She sought pain medication.  Tr. 225.
21 On December 22, 2003, Robinson came into Dr. Perry's office with a
22 toe injury, and stated she had been "going through more of her
23 Vicodin[1] because of it."  Tr. 223.      On January 29, 2004, Dr.
24 Perry noted that Robinson "has had narcotic-seeking behavior the
25 last several months.  From one pharmacy, she has had multiple

26

27     [1] Robinson's providers refer to Vicodin and hydrocodone
28 interchangeably, as Vicodin is a brand name for the narcotic pain
   reliever hydrocodone.

OPINION AND ORDER 6

1  providers prescribing Percocet, Lorazepam, Vicodin, and Flexeril."
2  Tr. 224.   Dr. Perry "confronted her regarding narcotic-seeking
3  behavior and the red flags that have been drawn up because of this
4  and the fact she does not have any identifiable pain syndrome."
5  Tr. 222.

6      On February 26, 2004, Robinson called Dr. Perry's office
7  several times stating she "is going to contact with a lawyer [*sic*]
8  stating that she is going to be withdrawing from narcotics because
9  I will not refill her hydrocodone." Tr. 221.  Dr. Perry noted that
10  when he most recently saw Robinson less than one month earlier, she
11  had "stated that she had lost all of her medications down either a
12  toilet or a sink." Tr. 221.  Dr. Perry concluded the Robinson was
13  "exhibiting very alarming symptoms of narcotic drug-seeking
14  behavior."  Tr. 221.

15      On August 3, 2004, Robinson returned to Dr. Bruce Perry
16  complaining of left shoulder pain.  Tr. 331.  Dr. Perry examined
17  Robinson's left shoulder, ordered imaging studies, and wrote,
18  "Three views of the left shoulder demonstrate no fracture or bony
19  lesion of the humerus.  The glenohumeral relationship is preserved.
20  There is moderate degenerative change with spurring at the
21  acromioclavicular joint.  No soft tissue calcifications are seen.
22  Impression: degenerative change at the AC joint." Tr. 331.  He
23  opined that Robinson had "probably myofascial pain syndrome." Tr.
24  338.  He also wrote that, "Narcotic treatment is not advised for
25  her left shoulder.  I see no reason to further  study her as I do
26  not see any evidence of rotator cuff impingement or significant
27  tendinitis today. . . . I recommend a trial of myofascial
28  techniques to the trigger points and discourage long term use of

OPINION AND ORDER 7

narcotics or tranquilizer type medications for this." Tr. 338-39.

On September 30, 2004, Robinson visited Dr. Perry and complained of diffuse pain in her lumbar spine, stating she "would like to change her dose of hydrocodone to allow her to take more." Tr. 216. At that visit she also complained of "pain radiating down her left arm." Tr. 216. It was noted she was also taking Prozac, allegedly for depression.[2]  Tr. 216. On October 22, 2004, Dr. Perry wrote that Robinson "has been taking more of Vicodin than written for. . . . She wanted to have oxycodone or something stronger." Tr. 215. Dr. Perry refilled the prescription, but instructed her to make her medications last a full month instead of running out early and getting a refill. Dr. Perry sent Robinson a letter terminating his relationship as her primary care physician on December 14, 2004. Tr. 214. The letter itself, however, is not in the record, and the doctor's reason for terminating the relationship is not explained.

On February 3, 2005, Robinson established care with Siskiyou and Joseph Patton, P.A. Tr. 322. In the intake interview her principal complaints were depression, chronic left shoulder pain, and hot flashes. Tr. 328. She was given a prescription for Vicodin. Tr. 328.

On February 24, 2005, Robinson saw internist Dr. Kristin Miller at Siskiyou. Dr. Miller noted that Robinson had come in "because of bilateral upper extremity pain worse on the left." Tr. 322. Dr. Miller noted that she was taking 7-8 Vicodin per day, but

---

[2] I note Robinson denied ever using Prozac on March 18, 2005, six months later.

OPINION AND ORDER 8

that it wasn't enough to control her pain, and "She requests a prescription for a muscle relaxer." Tr. 322. Dr. Miller wrote that Robinson had "uncertain diagnoses" and that she had a "history of chronic narcotic use." Tr. 322.

On March 18, 2005, Robinson reported to Physician's Assistant Patton, "she did not like the Effexor that she tried last month. She was switched to Lexapro and she liked that even less and switched back to Effexor until now. She has never tried Prozac and is attracted to the reasonable price and wants to try that." Tr. 318. On March 25, 2005, Robinson went to see Patton and told him that "her midback pain . . . started from moving furniture on March 7." Tr. 315.

On March 28, 2005, Robinson had an ultrasound of her abdomen, which Dr. David Oehling, a surgeon at Grants Pass Surgical Associates, characterized as "normal" and "unremarkable." Tr. 241.

On April 11, 2005, Robinson saw Joseph Patton again, who advised Robinson that "I want her to wean herself off narcotics for pain relief, but [she] insists that what she needs for comfort on a daily basis is 7.5 of Vicodin three times a day." Tr. 312. The same day, April 11, 2005, Dr. Oehling evaluated Robinson due to her complaint "of months blending into years now of abdominal pain." Tr. 239.

On April 25, 2005, the Oregon Department of Human Services referred Robinson to Katherine Greene, a psychologist, for a neuropsychological evaluation. Tr. 373. Robinson reported to Dr. Greene that she had a history of attempting suicide twice in her life—both times related to relationships ending, but denied any current suicidal ideation. Tr. 376. She "reported some depression

OPINION AND ORDER 9

1  and loss of energy and is currently being treated with medication

2  for depression." Tr. 376.  She reported that she "is bad with

3  dates and is forgetful." Tr. 376.  Robinson also reported to Dr.

4  Greene that she "has a history of substance abuse starting with

5  drinking at age 22.  She reported doing speed for a few months and

6  drinking 2-3 beers at night to unwind and sleep. . . . She said she

7  stopped doing drugs after her accident in 1993." Tr. 375.  The

8  record of the period of alleged disability, however, establishes

9  that although Robinson may have abandoned illegal drugs, she

10 maintained constant efforts to obtain prescription narcotics.

11     Dr. Greene noted, "Concentration, organization skills and

12 memory are reported to be intermittently problematic.  This may not

13 affect her overall general day-to-day activities but would likely

14 affect her ability to function in a job setting." Tr. 378.  Dr.

15 Greene opined that perhaps Robinson had diffuse brain damage from

16 an accident involving a three-wheeler in 1993.  Tr. 378.  Dr.

17 Greene performed testing on Robinson  and found her "learning and

18 memory skills would be considered low average overall." Tr. 377.

19 She wrote, "Personality assessment indicates Mild to Moderate

20 levels of interpersonal sensitivity and depression. Her symptoms of

21 depression seem to be helped with medication and she should

22 continue with medication treatment." Tr. 379.   Dr. Greene

23 diagnosed Robinson with an unspecified cognitive disorder, an

24 unspecified depression disorder, and ADHD in remission.  Tr. 379.

25     On May 4, 2005, Robinson saw Dr. Mark Deatherage M.D., a

26 surgeon and partner of Dr. Oehling at the Grants Pass Surgery

27 Center, for an esophagogastroduodenoscopy to evaluate her abdominal

28 pain.  Tr. 336.  Dr. Deatherage's conclusion was that Robinson had

OPINION AND ORDER 10

an "essentially normal appearing upper GI endoscopy." Tr. 336.   A biopsy from this exam was interpreted by Dr. Byron Arndt, M.D., a pathologist at Three Rivers Community Hospital, on May 5, 2005, as "mild chronic gastritis most consistent with chemical gastritis." Tr. 330.

The same day, May 5, 2005, Robinson consulted with another physician's assistant, Joan Price at Greentree Orthopedics, regarding left neck and shoulder pain.   Tr. 237.   After undergoing an extensive evaluation, Price concluded "findings on exam are negative for shoulder pathology except for some degenerative changes noted at the AC joint."   Tr. 234.   In conjunction with Dr. Foreman, an orthopedist at the same clinic presumably, Price noted that imaging studies showed, "Generally the findings are consistent with early degenerative disk and degenerative joint disease."   Tr. 238.

On May 12, 2005, Robinson went to Siskiyou and indicated to Nurse Roxanda Radomsky that "Prozac [was] working really, really well."   Tr. 307.   She was also noted to be taking Vicodin 750 mg 3 to 3 and 1/2 times per day.   Tr. 307.   On May 18, 2005, Robinson called Siskiyou complaining of severe constipation and "for relief for severe, stabbing stomach pains," and she was told to minimize narcotics as they make constipation worse.   Tr. 309.   She indicated she was taking Vicodin for the pain.   Tr. 309.

On May 19, 2005, Robinson appeared at Siskiyou indicating she "needs more pain relief."   Tr. 304.   Robinson was noted to out of drugs early.   The clinic refilled her hydrocodone prescription. Tr. 304.

On May 25, 2005, Robinson had imaging studies of her spine

OPINION AND ORDER 11

done, which revealed an "unremarkable C spine series." Tr. 335.

On May 26, 2005, Dr. Oehling did an upper GI series test on Robinson, and noted that "it looks as normal as anything could look." Tr. 242. He could not make a diagnosis about her abdominal pain.

On May 28, 2005, Robinson cancelled her appointment at Siskiyou citing pain, but asked if the clinic could refill her hydrocodone prescription until the next appointment, which the clinic did, less than two weeks after doing so on May 19, 2005. Tr. 302.

On May 31, 2005, Robinson underwent a neurological exam with neurologist Dr. Yung Kho M.D. to assess back pain. Dr. Kho's impression was that Robinson might have myofascial pain syndrome. Tr. 245.

On June 9, 2005, Robinson returned to the Siskiyou Community Health Center "for followup on neck pain and depression." Tr. 299. She reported that her abdomen was feeling better, but that her neck still hurt. Joseph Patton P.A. noted that "she moves easily," but continued her hydrocodone prescription. Tr. 299.

On June 20, 2005, Robinson had an MRI done on her back. Tr. 300. The MRI results do not appear directly in the record, but are referenced by other medical records, below. Tr. 290.

On July 7, 2005, Robinson went to Siskiyou and complained she was "sick of hurting." Tr. 293. She complained of pain in her arms, feet, knee, neck, and shoulder. She and nurse Radomsky discussed the use of a "long-acting opiate i.e. methadone." Tr. 293.

On July 21, 2005, Robinson went to Siskiyou for a chronic pain

OPINION AND ORDER 12

management visit and indicated to a nurse that she was experiencing more pain, and needed a higher dose of her pain medication or a different pain medication.  Tr. 290.  When the nurse called Dr. Chua, the doctor "sa[id] cervical MRI was normal- don't give more narcotics for neck pain."  Tr. 290.

On August 2, 2005, Robinson called the Siskiyou Community Health Center and told them she wanted a different muscle relaxer and she needed an early refill of her hydrocodone in order to overcome her pain to make it to the appointment the following day. Tr. 288.  The clinic did not refill the prescription early.  Tr. 288.  On August 4, 2005, Robinson returned to Siskiyou complaining of pain in her legs and feet, and Nurse Roxanda Radomsky refilled her prescription for Vicodin.  A pain contract on the next visit was suggested.  Tr. 289.

On August 18, 2005, Robinson went in for a chronic pain management visit and complained of pain in her left knee, right foot, and her back.  Tr. 286.  She indicated to nurse Roxanda Radomsky that she was taking Vicodin daily for her pain, and the nurse refilled her Vicodin prescription.  Tr. 286.  Robinson also told the nurse that the Prozac she was taking made her angry and she wanted to try Cymbalta.  Tr. 286.

On September 15, 2005, Robinson attended a chronic pain management visit at Siskiyou and complained that her pain had worsened in the mid-thoracic and post cervical spine, and in her left knee.  Tr. 280.

On October 27, 2005, Robinson went to Siskiyou complaining of knee pain.  Tr. 271.  On this date, more than six years after her alleged onset of disability, she told Nurse Radomsky that she was

OPINION AND ORDER 13

working as a cashier at Bi-mart, where she spent 8 hours standing each day.  Tr. 271.

On December 12, 2005, Robinson appeared at the Siskiyou Community Health Center to follow up on chronic pain and depression.  Tr. 264.  "She sa[id] her main complaint is her left knee pain but her back between her shoulder blades and lower lumbar area are bothering her frequently."  Tr. 264.  Robinson did not complain of left arm pain.  Tr. 264.  She stated that she "is not in the right job for her back."  Tr. 266.

On February 23, 2006, Robinson appeared at Siskiyou and saw Physician's Assistant Patton.  Patton noted that Robinson no longer wanted Percocet, but wanted to try Methadone.  Tr. 252.  The Percocet may stem from Dr. Chow's February 2001 prescription.  On March 16, 2006, Robinson reported to Siskiyou for a chronic pain management visit complaining of pain in her wrists, feet, and ankles, and asked to try methadone.  Tr. 407.  Robinson reported that day that she had realized "her constipation was really caused by consuming many pretzels." Tr. 399.

On April 14, 2006, nonexamining consulting psychologist Paul Rethinger, Ph.D reviewed Robinson's records and diagnosed her with an affective disorder.  Tr. 340.  He opined that her affective disorder created a mild difficulty in maintaining social functioning and a mild difficulty in maintaining concentration, persistence, or pace.  Tr. 350.  He opined Robinson had no restriction in the activities of daily living.  Tr 350.  Dr. Rethinger, after reviewing her entire medical record, wrote,

> It is readily apparent to providers and this DA that
> [Robinson]'s most significant barrier to steady
> employment is the interplay between her chronic

OPINION AND ORDER 14

widespread, unsubstantiated pain complaints, extensive
drug-seeking behavior, switching and manipulation of her
past PCPs, the engagement of medical specialists to
work-up pain w/o severe or explainable pathology and her
constant self-regulation of both psychotropic, analgesics
and opioids.

Tr. 352. In discussing her alleged depression, he noted that she

has never been to counseling, never been referred for counseling,

never had mental problems related to work, and never been

psychiatrically hospitalized. Tr. 352. He also pointed out that

doctors consistently described her as "pleasant," even when she

said she was in extreme somatic pain, which was often. "Given the

evidence in file," he continued, "there is no support for a

pathology that would lead to disabling memory loss." Tr. 352. He

concluded, "Mental allegations are not well-supported, credibility

is limited by reported function and lack of objective signs of

severe depression." Tr. 352.

By April 19, 2006, Robinson was taking methadone and

hydrocodone together everyday. Tr. 397. She continued to present

to Siskiyou frequently complaining of pain, and seeking refills on

a very regular basis. Tr. 389-397. On August 22, 2006, Robinson

called Siskiyou, saying that she had taken a trip to Portland and

her suitcases with her medications had been stolen, but she didn't

make a police report. Tr. 389. She wanted an early refill of

hydrocodone and methadone. Tr. 389. The records are not clear

whether her prescription was refilled. See Tr. 389.

There is a gap in the medical records from September of 2006

through May of 2008. By May of 2008, Robinson had established care

with internist Dr. Timothy Roberts, M.D. in Grants Pass  Tr. 429.

On May 20, 2008, Robinson complained to Dr. Roberts that "the

OPINION AND ORDER 15

biggest problem at the moment is her left knee." Tr. 429. He noted she had "chronic back and knee pain," and that she was still taking methadone and hydrocodone on a daily basis. Tr. 429. On June 10, 2008, Robinson went to see Dr. Roberts again. Tr. 428. The "pretense for the visit was left arm discomfort, but it quickly becomes apparent that although she has had some arm discomfort and weakness, she is actually out of her methadone now 10 days early." Tr. 428. Dr. Roberts advised her that she was in "violation of our agreement and any such further violations will lead to her termination from this clinic." Tr. 428.

On June 19, 2008, she appeared to address pain in her left elbow and left knee. Tr. 427. Dr. Roberts expressed frustration at still not having received Robinson's medical records from the Siskiyou Community Health Clinic. Tr. 427. On August 15, 2008, Robinson saw Dr. Roberts to follow up on chronic pain. She was supposed to bring in all of her medications for Dr. Roberts to review, and she was reminded to do so on the day of the appointment, but she failed to bring them in. Tr. 426. On October 22, 2008, she saw Dr. Roberts again. At that time he assessed she had chronic neck and back pain, depression, and knee pain. This is the last medical visit documented in the record.

A social security hearing before an administrative law judge was held on October 24, 2008.

Robinson's daughter Tawni did not testify at the hearing before the ALJ, but on November 17, 2008, she sent an email detailing that "some days she can't walk without help all day long. She has to prop her left leg often during the day for long periods due to cysts that have caused large knots and severe pain." Tr.

OPINION AND ORDER 16

187.  Robinson's daughter wrote that Robinson "doesn't comprehend basic social interactions anymore, and this has gotten progressively worse since her accident years ago."  Tr. 187.

Nonexamining consulting physician Dr. Neal Berner was asked to review the entire medical record and express his opinions about Robinson's physical limitations.  He noted that despite Robinson's constant insistence about her pain, there were few objective findings to support it,

> Physically, her lumbar films show mild DJD w/o stenosis or listhesis, her B/L knee films show mild OA, her left shoulder films x 2 are normal except for a calcified A/C, her EMG was negative for median nn entrapment bilaterally, her B/L ankle films are normal, her AP pelvis is normal.  On serial exams including PCPs and orthopaedics her left shoulder is limited d/t pain and minimal spasm, no impingement.  See Perry, MD ORTHO and his PA for extremely detailed left shoulder and cervical assessment and his discussion regarding the lack of specific dx and severity.

Tr. 361.  He concluded that the "physical allegations are not well-supported, credibility is limited by the aforementioned inconsistencies, objective findings on serial exams/imaging and reported function.  Capable of S&W 6/8, unlimited sit, L&C 10/20, posturals."  Tr. 361.  Dr. Berner also wrote that Robinson was "well known to manipulate her medical providers."  Tr. 366.

## DISCUSSION

Robinson argues that the ALJ erred by (1) failing to properly credit the testimony of Dr. Greene; (2) failing to properly credit Robinson's subjective symptom testimony; (3) failing to properly credit the lay witness testimony of Robinson's daughter; (4) failing to consider the combined effect of her impairments; and (5) giving an incomplete hypothetical to the vocational expert ("VE") and failing to properly credit the VE's testimony.

OPINION AND ORDER 17

1    I address each assignment of error in turn.

2    I.    Examining Physician Testimony

3    The weight given to the opinion of a physician depends on
4    whether the physician is a treating physician, an examining
5    physician, or a nonexamining physician.  More weight is given to
6    the opinion of a treating physician because the person has a
7    greater opportunity to know and observe the patient as an
8    individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If
9    a treating or examining physician's opinion is not contradicted by
10    another physician, the ALJ may only reject it for clear and
11    convincing reasons.  Id. (treating physician); Widmark v. Barnhart,
12    454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if
13    it is contradicted by another physician, the ALJ may not reject the
14    opinion without providing specific and legitimate reasons supported
15    by substantial evidence in the record.  Orn, 495 F.3d at 632;
16    Widmark, 454 F.3d at 1066.  The opinion of a nonexamining
17    physician, by itself, is insufficient to constitute substantial
18    evidence to reject the opinion of a treating or examining
19    physician.  Widmark, 454 F.3d at 1066 n.2.  Opinions of a
20    nonexamining, testifying medical advisor may serve as substantial
21    evidence when they are supported by and are consistent with other
22    evidence in the record.  Morgan v. Commissioner of Social Security
23    Administration, 169 F.3d 595, 600 (9th Cir. 1999).

24    According to Robinson, the ALJ erred by (1) improperly
25    rejecting the opinions of Dr. Katherine Greene, a psychologist, not
26    a physician, and (2) improperly substituting her own opinion for
27    the opinions of Robinson's treating and examining physicians.

28    A.    Dr. Greene

OPINION AND ORDER 18

According to Robinson, the ALJ failed to properly credit Greene's conclusions about Robinson's mental abilities. Dr. Greene is an examining psychologist. She is not a treater, nor is she a physician. As noted above, Greene related that Robinson's *self-reported* concentration, organizational skills, and memory problems "may not affect her overall general day-to-day activities but would likely affect her ability to function in a job setting." Tr. 378. Dr. Greene diagnosed Robinson with an unspecified cognitive disorder, an unspecified depression disorder, and ADHD in remission. Tr. 379.

The ALJ discussed Dr. Greene's testing and conclusions at length. Tr. 62. After considering Dr. Greene's testimony, the ALJ found depression and a cognitive disorder to be severe impairments. Tr. 55. Moreover, she included limitations for these concerns in Robinson's residual functional capacity, which precluded contact with the public, and which limited Robinson to 1 to 3 step tasks which are consistent with entry level work in the Dictionary of Occupational Titles ("DOT"). Tr. 57. Therefore, the ALJ did not reject, but rather adopted, the findings of Dr. Greene.

Robinson does not identify exactly what the ALJ should have credited, but did not. This is not surprising as Dr. Greene never opined what restriction(s) Robinson might have in a job setting, she simply concluded Robinson's self-reported symptoms "would likely affect her ability to function in a job setting." Without any specific finding by Dr. Greene, there is no reversible error here.

Other evidence in the record also supports affirming the Commissioner. Dr. Rethinger noted, and the record supports, that

OPINION AND ORDER 19

despite Robinson's reports of mental problems, she has never been to counseling, never had mental problems related to work, her doctors consistently described her as "pleasant," and she never exhibited any objective signs of severe depression.    Although "[s]he said [to Dr. Greene] her memory has not improved in that she still forgets to take her medication, needs to be reminded about her appointments," Tr. 369, the medical record shows that she went to appointments very consistently and that her first priority was her medications.    There is no significant evidence of missed appointments.    It's difficult to believe she "forgets to take her medication," yet runs out of her prescriptions early on such a regular basis.    Dr. Greene evaluated Robinson just twice, and relied heavily on Robinson's self reports about her condition.    She did not evaluate the medical record.    Tr. 373.    This is perhaps most apparent in Dr. Greene's unawareness of Robinson's drug seeking behavior and doctor shopping.    The ALJ did not err in the evaluation of Dr. Greene's opinions.

B.    Other treating and examining physicians

Robinson alleges that the ALJ "attributed Plaintiff's painful left arm symptoms to myofascial pain syndrome and seemed to question the medical bases for Plaintiff's complaints of numbness and tingling in her left hand, asserting there is 'no diagnosis of the cause of such symptoms.'"    Pl.'s Br. at 26.    Robinson assigns error to the ALJ's acceptance of myofascial pain syndrome as a severe impairment, but simultaneous finding that Robinson's "undiagnosed upper extremity pain is nonsevere."    Id.

Robinson's less than clear assignment of error seems to allege that the ALJ erred by failing to credit medical evidence that

OPINION AND ORDER 20

purportedly shows Robinson, in addition to having the severe impairment of myofascial pain syndrome in her left arm, also has another severe impairment in her left arm.  This argument is without merit.

The sole imaging study done to try and find objective verification of a problem with Robinson's left arm was ordered by Dr. Bruce Perry on August 3, 2004.  After looking at her films, he summarized the images: "Three views of the left shoulder demonstrate no fracture or bony lesion of the humerus.  The glenohumeral relationship is preserved.  There is moderate degenerative change with spurring at the acromioclavicular joint.  No soft tissue calcifications are seen.  Impression: degenerative change at the AC joint."  Tr. 331.  He opined that Robinson "probably [had] myofascial pain syndrome." Tr. 338.  He also saw no "evidence of rotator cuff impingement or significant tendinitis today," and found whatever left arm problem existed to be sufficiently inconsequential that it didn't merit narcotics to treat it.  Again this doctor offered no information regarding restrictions in Robinson's activities.

Robinson's extreme drug seeking behavior overshadows all of her reports of pain, including her reports related to her left arm, which were sporadic.  For example, Robinson did not report any pain pertaining to her left arm or hand to Dr. Chow during any of her visits with him between October 2000 and January 2003.  Tr. 190-212.  From 2004-2006, many times Robinson would appear for medical visits complaining only of her back, or another symptom, with no mention her left arm.  As recently as May 20, 2008, Robinson complained to Dr. Roberts that "the biggest problem at the moment

OPINION AND ORDER 21

1   is her left knee." Tr. 429.  On June 10, 2008, when Robinson saw

2   Dr. Roberts, the **"*pretense*** for the visit was left arm discomfort,

3   but it quickly becomes apparent that although she has had some arm

4   discomfort and weakness, she is actually out of her methadone now

5   10 days early." Tr. 428. (emphasis added).

6       When Dr. Berner reviewed the entire medical record, it gave

7   him an advantage of a longitudinal look at the situation compared

8   to a  sporadic treating doctor or examiner.  His conclusion was

9   that there was a "lack of specific dx and severity" with regard to

10  Robinson's left arm.  Tr. 361.  He opined that the "physical

11  allegations are not well-supported, credibility is limited by the

12  aforementioned inconsistencies, objective findings on serial

13  exams/imaging and reported function. Capable of S&W 6/8, unlimited

14  sit, L&C 10/20, posturals."  Tr. 361.

15      Perhaps most importantly, there is absolutely nothing in the

16  record indicating that Robinson's left arm condition, whatever it

17  might be, limits her ability to work.  I find the ALJ did not err

18  in failing to include an additional impairment related to the left

19  arm, or with respect to the evaluation of Robinson's myofascial

20  pain syndrome.

21  II.  Subjective Symptom Testimony

22      When deciding whether to accept the subjective symptom

23  testimony of a claimant, the ALJ must perform a two-stage analysis.

24  In the first stage, the claimant must produce objective medical

25  evidence of one or more impairments which could reasonably be

26  expected to produce some degree of symptom.  Lingenfelter v.

27  Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not

28  required to show that the impairment could reasonably be expected

OPINION AND ORDER 22

to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." Id. Evidence of malingering, however, by itself, is enough to discredit a claimant. Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040.

The ALJ found that Robinson's "frequent requests for early narcotic refills and non-compliance with dosing schedules highlight the discrepancy between her pain complaints and the almost total lack of objective findings to support any pain complaint at all." Tr. 63. The ALJ continued, "Ms. Robinson's choice to adopt a disabled lifestyle is not consistent with her actual physical condition or the recommendations of treating sources." Tr. 63. On this basis, the ALJ concluded that "Ms. Robinson's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Ms. Robinson's statements concerning intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with above residual functional capacity assessment." Tr. 58.

There is no doubt that the record has ample evidence to support the ALJ's specific, clear and convincing reasons to accord little weight to Robinson's subjective symptom testimony.

On January 29, 2004, Dr. Perry noted that Robinson "has had narcotic-seeking behavior the last several months. From one pharmacy, she has had multiple providers prescribing Percocet,

OPINION AND ORDER 23

Lorazepam, Vicodin, and Flexeril." Tr. 224. On February 26, 2004, Dr. Perry noted that Robinson was still "exhibiting very alarming symptoms of narcotic drug-seeking behavior." Tr. 221. As recently as June 2008, Robinson's most recent primary care physician, Dr. Timothy Roberts, noted that her visit alleging arm discomfort was a "pretense" for getting an early methadone prescription refill. Tr. 428.

This coupled with the stomach complaints of pain with extensive testing that revealed no bases for a pain complaint, left arm pain complaints with minimal objective findings and treating doctors opining that no prescription medications were appropriate for the arm and refusal by the doctors to prescribe them, and Dr. Rethinger's opinions above, are specific, clear and convincing reason to accord little weight to Robinson's subjective symptom testimony.

These incidents, combined with the absence of objective findings to support many of Robinson's pain complaints give the ALJ ample reasons to question Robinson's credibility. The ALJ did not, therefore, err in according little weight to Robinson's subjective symptom testimony.

III. <u>Lay Witness Testimony</u>

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless she gives reasons for the rejection that are germane to each witness. <u>Stout v. Comm'r Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006). A medical diagnosis, however, is beyond the competence of lay witnesses. <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996). A legitimate reason to discount lay testimony is that it conflicts

OPINION AND ORDER 24

with medical evidence.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

Robinson alleges the ALJ failed to state germane reasons for rejecting the lay testimony of Tawni Robinson, the claimant's daughter.  I find this argument unpersuasive.

In her report, the ALJ discussed the younger Robinson's testimony at length.  Tr. 59.  After discussing it, the ALJ explained why she accorded the testimony "little weight." Tr. 59. The ALJ noted that Tawni had testified that her mother "has to prop her left leg often during the day for long periods due to cysts that have caused large knots and severe pain." Tr. 187.  The ALJ characterized this an an "obvious overstatement of a single Baker's cyst," and explained, "Using that a benchmark, one can reasonably assume the balance of the statement is similarly inflated."  Tr. 59.

I find the ALJ gave a germane, legitimate reason to accord little weight to the testimony of Tawni Robinson, and she did not err in this regard.

IV. <u>Combined Effect of Impairments</u>

Robinson alleges that "The ALJ did not properly consider the combined effect of Plaintiff's multiple impairments, severe and non-severe, as to whether the combined effect should be regarded to be of sufficient severity, without regard to whether any impairment considered separately would be of sufficient severity to result in limitations of disabling severity or limitations equal in severity to those specified in the Listings." Pl.'s Br. at 6.

Robinson appears to allege, therefore, that the ALJ did not consider the combined effects of Robinson's impairments in deciding

OPINION AND ORDER 25

if she was disabled.  This argument, too, has no merit.

The ALJ's decision begins by citing many different applicable laws and regulations pertaining to the claimant's "combination of impairments."  See Tr. 53-54.  The ALJ was specific, "All of Ms. Robinson's non-severe and severe impairments[3] were considered in combination in arriving at the residual functional capacity set forth below."   Tr. 57.   The ALJ continued, "the claimant's impairments, severe and non-severe,

singularly and in combination, are not accompanied by the findings specified for any impairment or combination of impairments included in any section of the listings." Tr. 57. This language is followed in the opinion by the ALJ's formulation of the RFC, which, by its nature, lists a combination of limitations.   In turn, the combination of limitations was presented to the VE, who found that Robinson's combination of limitations does not preclude her from working.

This argument, therefore, is without merit.  The ALJ did not err in this regard.

V.   Vocational Expert

Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant. Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001).   A hypothetical that includes a residual functional capacity which

---

[3] The ALJ found that Robinson had the following severe impairments: myofascial pain syndrome, mild left knee osteoarthritis with Baker's cyst, bilateral lower extremity varicose veins, depression, and cognitive disorder NOS.  See Tr. 55.  The ALJ did not specify the non-severe impairments she considered, but generally discussed all of the impairments that Robinson complained of throughout the medical record.

OPINION AND ORDER 26

1  incorporates the limitations and restrictions of the claimant,
2  established by the record, is sufficient. <u>See</u> <u>id.</u>

3      Robinson's final assignment of error alleges that the ALJ gave
4  the vocational expert ("VE") an incomplete hypothetical and
5  "disregarded the vocational expert's answer when questioned
6  concerning Plaintiff's actual condition as evidenced by the
7  record." Pl.'s Br. at 6. Robinson does not have a separate
8  argument section of her brief pertaining to this assignment of
9  error. Her only mention of the vocational expert in the argument
10 section of her brief relates to Tawni Robinson's testimony. She
11 argues that Tawni Robinson's testimony that her mother needs to lie
12 down at least an hour and a half in the middle of the day should
13 have been accepted. Pl.'s Br. at 28. She points out if this
14 limitation were accepted, then, according to the VE's testimony,
15 Robinson would have been disabled. See Pl.'s Br. at 28.

16     The ALJ did question the VE on this topic. At one point in
17 the October 24, 2008 hearing, the ALJ asked the VE, "At any
18 exertional level, if an individual required the opportunity to lie
19 down for an hour and a half in the middle of the day, would there
20 be work?" Tr. 42. The VE answered, "No, ma'am. That would
21 eliminate competitive employment." Tr. 42.

22     The ALJ did not, however, ultimately include this limitation
23 in the residual functional capacity. Aside from the testimony of
24 Tawni Robinson, there is no other support in the record for this
25 limitation. I have already discussed, above, why the ALJ did not
26 err in according little weight to Tawni Robinson's testimony.
27 Having not credited this testimony, there is no reason why the ALJ
28 must include this limitation in her formulation of the RFC. The

OPINION AND ORDER 27

1    ALJ did not err in this regard.

2         In her Reply, Robinson raises for the first time the argument
3    that if the ALJ had properly credited the testimony of Dr. Greene,
4    she would have found that Robinson would be off task for a third of
5    each work day, which would preclude competitive employment.  This
6    argument is similar to the argument related to Tawni Robinson, and
7    is equally without merit.

8         At the hearing, Robinson's attorney tried to equate Dr.
9    Greene's comment about "intermittent organizational and memory
10   skills" to a diagnosis that Robinson would be distracted from her
11   work tasks for a third of each day.  Tr. 43-44.  The VE testified
12   that if a person were not able to maintain their production pace or
13   stay on task a third of each day, they would not be competitively
14   employable.  Tr. 44.

15        There are multiple problems with this alleged error.  First
16   and foremost, Dr. Greene did not opine the Robinson would be off
17   task for a third of each day.  Thus, the VE's testimony about an
18   individual with such a limitation is of no consequence.  The ALJ
19   did not err in failing to add this limitation to the RFC, or by
20   ignoring the VE's testimony about an individual with such a
21   limitation.  Second, I have already discussed, above, why the ALJ
22   did not err in assigning only partial weight to the testimony of
23   Dr. Greene.

24   ///

25   ///

26   ///

27   ///

28   ///

OPINION AND ORDER 28

**CONCLUSION**

Accordingly, based on the record, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated this <u>31</u> day of <u>March</u>, 2011.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

OPINION AND ORDER 29